640 So.2d 59 (1994)
DANIEL PETERKA, APPELLANT,
v.
STATE OF FLORIDA, APPELLEE.
No. 75995.
Supreme Court of Florida.
April 21, 1994.
Rehearing Denied August 5, 1994.
*62 Nancy A. Daniels, Public Defender, and David A. Davis, Asst. Public Defender, Second Judicial Circuit, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and Richard B. Martell, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Daniel Peterka appeals his conviction for first-degree murder and his resulting death sentence. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. We affirm Peterka's conviction for first-degree murder and his death sentence.
The evidence at trial revealed that on February 11, 1989, Daniel Peterka was to surrender himself to authorities in Nebraska to begin serving two consecutive one-year prison terms for theft. Peterka met with his *63 girlfriend, Cindy Rush, and told her that he did not want to go to jail, that he wanted to get a job and establish himself somewhere else. After arguing with Rush, Peterka walked away.
Peterka reappeared in Niceville, Florida, at the end of February 1989, and eventually moved in with Ronald LeCompte, a man Peterka had met at work. Shortly thereafter, Peterka explained that he did not have any identification, and asked LeCompte to sign for the purchase of a .357 magnum handgun. LeCompte signed as a favor to Peterka.
Sometime in April 1989, Peterka moved into a rental duplex with John Russell, the victim in this case. According to Russell's cousin, Deborah Trently, Peterka and Russell did not have a good relationship. Connie LeCompte, a friend of Peterka's, testified that Peterka told her that "if everything went like he wanted it to, he was going to be moving back up North."
On June 27, 1989, Peterka went to the motor vehicle department and applied for and received a duplicate driver's license in the name of John Russell. The license contained Peterka's picture and Russell's name. On that same day, Peterka cashed a three-hundred-dollar money order that was payable to Russell and had been mailed to Russell by a relative. Russell became concerned when he did not receive the money order in the mail. He obtained a photocopy of the money order from his relative and told his cousin Deborah Trently that he suspected that Peterka had stolen the money order. Further, Russell stated that he did not intend to confront Peterka about the money order until the gun was out of the house and that he would let the police handle the matter. On July 11, 1989, Russell contacted Kimberly Cox, an employee at Vanguard Bank, about his money order. Russell showed Cox a photocopy of the money order and stated that he had not endorsed the back of the money order. Russell told Cox that he thought that his roommate had cashed the money order. Cox testified that she told Russell that a formal prosecution for forgery could not begin until the bank received the original money order. Cox further testified that Russell stated that he did not intend to bring up the matter with his roommate and that he would let the police handle the situation. Finally, Lori Slotkin, Russell's girlfriend, testified that on the night of July 11, 1989, Russell told her that he was waiting for the bank to obtain the original money order so that he could bring charges against Peterka. Slotkin also testified that Russell stated that he did not intend to confront Peterka because he was nervous about the gun.
Slotkin testified that she last saw Russell at 2:30 a.m. on July 12, 1989. Frances Thompson, Peterka's girlfriend, testified that on the morning of July 12, 1989, Russell helped her move her belongings out of the duplex. Thompson also testified that at 8:30 p.m. on July 12, 1989, Peterka came by her work, driving Russell's car. Peterka and Thompson went out to dinner and drove to the beach in Russell's car. At dinner, Peterka told Thompson that he was a fugitive from Nebraska and he talked about "not wanting to go to prison." Afterwards they returned to the duplex. Thompson spent the night at the duplex and went to work the next morning.
Russell's friend and co-worker, Gary Johnson, became worried when Russell did not show up for work on July 13, 1989, which was a payday. Johnson drove over to the duplex around 9 a.m. and saw Russell's car parked in the driveway. When no one answered the door, Johnson climbed through a window. Once inside the duplex, Johnson saw Russell's car keys, cigarettes, and lighter on a table. Johnson also noted that three of the cushions from the couch were missing. Johnson then looked in Peterka's bureau for the gun. He found it unloaded, with six live shells lying beside it. Johnson left the house and returned to work. After work, Johnson returned to the duplex and asked Peterka where Russell was or when Russell had left. Peterka stated that he did not know Russell's whereabouts. After Johnson left the duplex, Kevin Trently, the husband of Russell's cousin, came over to inquire about Russell. Peterka told Trently that Russell had left with someone the previous night.
Johnson filed a missing person report with the Okaloosa County Sheriff's Office that *64 night. Deputy Harkins went to the duplex around 8 p.m., accompanied by Johnson and two others. Peterka was at the duplex with Thompson. Peterka told Harkins that Russell had left the previous day with "some long-haired guy." When Harkins asked Peterka for identification, Peterka told him that he had lost his driver's license, but gave him a birth certificate. After Harkins and the others left, Thompson asked Peterka if he knew Russell's whereabouts. Peterka indicated that he did not.
Harkins ran Peterka's name and birth date in the sheriff's office's computer. The computer check indicated that Peterka was a fugitive from Nebraska with an outstanding warrant against him and that he was considered "armed and dangerous." After receiving verification of the computer check, Harkins and other deputies arrested Peterka around 1:30 a.m. the next morning. The deputies searched the duplex and found the gun. Peterka showed the police the bill of sale for the gun and convinced them that it belonged to a friend. The deputies did not seize the gun. The deputies also found Peterka's wallet, containing the driver's license with Peterka's picture and Russell's name, other items of identification belonging to Russell, $407, a newspaper clipping advertising jobs in Alaska, and Peterka's Nebraska driver's license.
At approximately 7 a.m. on July 14, 1989, Peterka was transferred to the county jail. Peterka telephoned Thompson and asked her to remove some of his belongings from the duplex and to save them. Thompson offered to remove the gun from the duplex and to keep it for Peterka. While in the duplex, Thompson noticed that some of the couch cushions were outside. She also discovered a shovel in the trunk of the victim's car. After Thompson called the sheriff's department and told them what she had found, several law enforcement officers searched the duplex. "Shorty" Purvis, the owner of the duplex and Peterka's employer, gave law enforcement Peterka's handgun, which he had obtained from Thompson. The police search revealed blood stains on the couch where the cushions had been and on the carpet under the couch. A search of the trunk of the victim's car revealed a shovel, some sand, blood stains on the tail lights, and blood inside the trunk.
On July 18, 1989, Peterka called Purvis and asked him to come to the jail. Peterka told Purvis that he had accidentally killed Russell during a fight over the money order. When Purvis replied that he would tell the police everything that Peterka said, Peterka agreed. At Peterka's urging, Purvis summoned Deputy Atkins, who advised Peterka of his rights.
Peterka's statement to the police recounted the following events: Peterka forged Russell's signature and cashed the money order. He paid Russell one hundred dollars to use Russell's identification. Russell instigated a shoving match over the money order that escalated into a fight in the living room of the duplex. Both men reached for Peterka's gun, but Peterka got it first. As Russell got up from the couch, the weapon accidentally fired and the bullet entered the top of Russell's head. Russell fell down on the couch. Peterka wrapped Russell's body in a rug, drove to a remote part of Eglin Air Force Base, and buried the body in a shallow grave. After giving this statement, Peterka agreed to take law enforcement to the body. Upon his return to the sheriff's office, Peterka agreed to give a videotaped statement, which was similar to the statements that he had given earlier. The trial court admitted this videotaped statement into evidence.
The medical examiner testified that he was unable to determine the proximity of the gun's muzzle to the victim's head by examining the tissue near the wound because the body was severely decomposed when found. However, based upon the shape and size of the wound and the residue of powder that formed a very black ridging of soot around the point of entry into the skull, the medical examiner concluded that the victim died from a close range gun shot to the head. The medical examiner also testified that the wound was consistent with the victim having been shot from behind while he was in a reclining position.
A firearms expert testified that Peterka's gun was in good working order, and that in his opinion, based on tests, the gun would not *65 fire accidentally. He further stated that the gun had two safety mechanisms to prevent the hammer of the gun from striking the cartridge chamber unless the trigger was pulled.
The jury found Peterka guilty of first-degree murder and recommended death by a vote of eight to four. The trial court found that the following aggravating circumstances applied to the homicide: 1) committed while under a sentence of imprisonment;[1] 2) committed for the purpose of avoiding or preventing a lawful arrest;[2] 3) committed for pecuniary gain;[3] 4) committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws;[4] and 5) committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[5] In mitigation, the trial court found that Peterka had no significant history of prior criminal activity. The trial court stated that it did not find any nonstatutory mitigating circumstances. After weighing the aggravating and mitigating circumstances, the trial court followed the jury's recommendation and sentenced Peterka to death.
Peterka raises twelve issues on appeal, claiming that the trial court erred by: 1) excusing for cause prospective juror Piccorossi because of his personal opposition to the death penalty; 2) denying Peterka's motion to suppress his statements to the police; 3) denying Peterka's motion for judgment of acquittal based upon insufficient evidence of premeditation; 4) admitting hearsay evidence that Peterka had fled Nebraska and was considered "armed and dangerous"; 5) admitting testimony that the victim suspected Peterka of stealing the money order and that the victim intended to let the police handle the matter; 6) admitting into evidence a photograph of the victim's skull; 7) entering a sentencing order that lacked clarity; 8) finding the aggravating factor that the homicide was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws; 9) finding that the murder was committed for pecuniary gain; 10) referring to other "mitigating circumstances" in the sentencing order without stating what they were or why they did not amount to mitigation as required by Campbell v. State, 571 So.2d 415 (Fla. 1990); 11) allowing the state, during cross-examination of Peterka's mother at the penalty phase, to allege that Peterka had an extensive juvenile record; and 12) partially denying Peterka's motion to suppress his statements because he repeatedly asked for assistance of counsel, which law enforcement ignored.[6]

Guilt Phase
Issue one (excusing juror for cause) was not preserved below as defense counsel did not object when the trial court dismissed prospective juror Piccorossi for cause. Piccorossi opposed the imposition of the death penalty for practical reasons. In assessing whether to excuse a juror because of the juror's views on capital punishment, the test is "whether the juror's views would `prevent or substantially impair the performance of [the juror's] duties as a juror in accordance with [the juror's] instructions and [the juror's] oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 44, 100 S.Ct. 2521, 2525-26, 65 L.Ed.2d 581 (1980)) (clarifying decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). However, in order to raise this issue on appeal the defendant must preserve it below. Cannady v. State, 620 So.2d 165 (Fla. 1993); see also Floyd v. State, 569 So.2d 1225 (Fla. 1990), cert. denied, 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991). The record in the instant case reveals no contemporaneous objection to the trial court's dismissal for cause of Piccorossi; thus, the issue is not preserved for appeal.
*66 Cannady. However, even if we considered this issue, the record shows Piccorossi stated an inability to set aside his personal beliefs in deference to the law. Thus, the trial court did not abuse its discretion in excusing Piccorossi for cause.
Peterka next claims that the trial court erred in denying his motion to suppress statements that he gave to law enforcement on July 18, 1989. Peterka was arrested on July 14, 1989, about 1:30 a.m., because a computer check revealed he was an escaped felon from Nebraska. Following the arrest, law enforcement searched Peterka's apartment and found a driver's license with the victim's name but Peterka's picture, as well as the victim's bank card, video-rental card, and Social Security card in Peterka's wallet. Peterka was transported to the sheriff's department, where he was read his Miranda[7] rights and signed a written waiver form. During this questioning, which began at approximately 1:50 a.m., Peterka stated that he had paid the victim a hundred dollars for the use of his identification and that the victim had left the apartment with another individual and had not returned. When Peterka stated that he did not want to answer any more questions, law enforcement immediately stopped the questioning and placed Peterka in a holding cell.
Peterka's next contact with law enforcement occurred on July 14, 1989, at approximately 5:30 p.m. after law enforcement completed a search of Peterka's apartment. Investigator Vinson advised Peterka of his Miranda rights again, and Peterka signed a waiver form. Peterka again stated that the victim had left the apartment with a stranger and had not returned. He contended that he did not know about any blood stains on the couch and that he was cleaning the cushions from the couch because they were dirty.
Four days later, on July 18, 1989, Vinson questioned Peterka again. Vinson again advised Peterka of his Miranda rights and Peterka once again signed a waiver form. Peterka reiterated his claims that the victim sold Peterka the identification and that the victim left the apartment complex with a stranger. Peterka also stated that he used the false identification with the victim's name to cash the money order belonging to the victim. Vinson informed Peterka that law enforcement believed that he had something to do with the victim's disappearance. Vinson also stated that if the death occurred because of a fight or accident there was a chance Peterka could be charged with second-degree murder or manslaughter, but if the victim was deliberately killed the charge would be first-degree murder. Vinson also explained the possible penalties associated with these charges and informed Peterka that law enforcement was meeting with the State Attorney's Office to determine whether to charge Peterka with first-degree murder.
Upon Peterka's request, an officer made a phone call to Purvis and asked him to come to the jail to talk about the victim. Purvis and Peterka were left alone in a room. When Peterka confided that he had shot the victim during an argument, Purvis told Peterka that he would have to tell "the law" anything Peterka told him and that he could "keep nothing from them." Peterka replied that he wanted Purvis to tell the police, adding that he wanted to get it off his chest. Accordingly, Purvis called Deputy Atkins into the room. Atkins read Peterka his Miranda rights, which he appeared to understand. Atkins asked both Peterka and Purvis to write down the content of Peterka's statements on the statement forms provided. Atkins also stated that Peterka confessed to killing the victim during a fight.
Vinson and Sheriff Gilbert returned to the interrogation room after Atkins contacted them about Peterka's confession. The sheriff read Peterka his Miranda rights again and Peterka signed another waiver form. According to Vinson, Peterka agreed to take law enforcement to the victim's body. When the group returned to the sheriff's department near midnight, Vinson showed Peterka a copy of the waiver form that he had signed earlier that night and asked him if he was still willing to give a statement. Peterka agreed to give a videotaped statement. Vinson indicated that he made no promises or inducements to Peterka in order to obtain *67 the statement. Peterka said that the victim had instigated the argument and that he had shot Russell during a fight. Peterka also stated that he led the police to the victim's body because it was the right thing to do.
Peterka moved to suppress the statements that he made to law enforcement officers on the afternoons of July 14 and 18, 1989. The trial court granted Peterka's motion to suppress, after the State indicated that it would not oppose suppression of the statements.
On appeal, Peterka contends that the statements he gave to Deputy Atkins and other law enforcement officers later during the day of July 18 should also have been suppressed. Peterka argues that the trial court erred in failing to consider whether the "taint" of his suppressed conversation with Vinson on July 18 had been removed when Peterka re-initiated contact later that day. Peterka also asserts that the trial court erred in failing to determine whether Vinson's "lure" of a reduced charge affected the voluntariness of Peterka's subsequent confession. Finally, he claims that the statements should have been suppressed because he repeatedly asked for the assistance of counsel. We find no merit to Peterka's arguments.
Vinson's July 18 conversation with Peterka, in which Peterka asked to speak with Purvis, did not "taint" any subsequent statements that Peterka made. While not entirely clear, it appears that the State conceded that Peterka's July 14 and 18 statements to Vinson should be suppressed because the statements were given when Vinson re-initiated contact after Peterka stated his desire for questioning to cease. Although the State conceded this point, the record does not support the conclusion that Vinson's July 18 contact was improper. See Michigan v. Mosley, 423 U.S. 96, 102-03, 96 S.Ct. 321, 325-26, 46 L.Ed.2d 313 (1975) (invoking Fifth Amendment right to remain silent does not "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject"). Vinson's July 18 interrogation occurred four days after Peterka invoked his right to remain silent. Vinson read Peterka his Miranda rights again, and Peterka waived those rights. See Mosley, 423 U.S. at 106, 96 S.Ct. at 327-28 (finding police honored defendant's right to remain silent based upon several factors, including fact that questioning resumed "only after the passage of a significant period of time" and the "provision of a fresh set of warnings"). Moreover, even if Vinson's July 18 questioning violated Peterka's right to remain silent, no "taint" carried over to Peterka's statements to Atkins as Peterka himself initiated this contact with the police.
Further, Vinson's statements did not delude Peterka as to his "true position, or ... exert improper and undue influence over his mind." Brewer v. State, 386 So.2d 232, 236 (Fla. 1980) (quoting Frazier v. State, 107 So.2d 16, 21 (Fla. 1958). Rather, Vinson truthfully informed Peterka of the different degrees of homicide and that law enforcement was seeking to charge him with first-degree murder. The record also shows that Vinson made no promises of leniency in return for any statements, did not threaten Peterka, and did not use violence to induce the statements. Peterka was advised of his Miranda rights and signed a voluntary waiver of those rights.
Peterka's claim that the statements were given in violation of his Fifth and Sixth Amendment rights to counsel is also without merit. Peterka did not invoke either his Fifth or Sixth Amendment rights to counsel during interrogation by law enforcement. The interview was terminated when Peterka indicated that he did not wish to answer any more questions, thereby invoking his Fifth Amendment right to remain silent. Peterka's motion to suppress did not assert a violation of his Fifth or Sixth Amendment rights to counsel as a basis for excluding these statements. In fact, at the suppression hearing, defense counsel affirmatively stated that the Sixth Amendment right to counsel was not at issue and that the Fifth Amendment right to counsel only applied to the extent of determining the voluntariness of Peterka's statements. Thus, we conclude that the trial court did not err in admitting Peterka's July 18 statements to Atkins or other officers.
Peterka asserts that the trial court erred in denying his motion for a judgment *68 of acquittal because the State presented insufficient evidence as to premeditation. Peterka argues that the circumstantial evidence does not exclude his reasonable hypothesis that the killing was accidental. We disagree. The element of premeditation may be established by circumstantial evidence when the evidence relied on by the State is inconsistent with every other reasonable inference. Cochran v. State, 547 So.2d 928 (Fla. 1989). The jury determines whether the circumstantial evidence fails to exclude all reasonable hypotheses of innocence, and where substantial, competent evidence supports the jury's verdict, that verdict will not be reversed on appeal. Heiney v. State, 447 So.2d 210, 212 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984). The circumstantial evidence standard does not require the jury to believe the defense version of the facts on which the State has produced conflicting evidence, and the State, as appellee, is entitled to a view of any conflicting evidence in the light most favorable to the jury's verdict. Cochran, 547 So.2d at 930.
We find that there was substantial and competent evidence to support the jury's verdict of first-degree murder in the instant case. Peterka claimed that he shot the victim during a fight instigated after the victim confronted him about the stolen money order. However, the record shows that the victim told several witnesses that he did not intend to confront Peterka about the stolen money order because he feared Peterka and the gun in the house. Further, the State introduced expert testimony that the gun was fired close to or against the top of the victim's head while the victim was in a reclining position. A firearms expert testified that the gun only could be fired by applying between two and one half to nine pounds of pressure on the trigger. That, together with the safety mechanisms of the gun, would have prevented an accidental firing. Finally, the evidence of the contents of Peterka's wallet, including a driver's license in the victim's name but Peterka's photograph, other identification belonging to the victim, and an advertisement of job listings in Alaska, support the finding of premeditation.
Next, Peterka asserts that the trial court erred in admitting testimony that he was an escaped fugitive from Nebraska and was considered "armed and dangerous" as this testimony was hearsay, irrelevant, and highly prejudicial. Under section 90.801(1)(c), Florida Statutes (1989), hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. Hearsay testimony that does not fall within a recognized exception is excluded from evidence. The hearsay rule prevents the admission of an out-of-court statement to prove a fact through extrajudicial statements. State v. Baird, 572 So.2d 904, 907 (Fla. 1990). An out-of-court statement, however, may be admitted for a purpose other than proving the truth of the matter asserted, if the statement is relevant to prove a material fact and is not outweighed by any prejudice. See §§ 90.402, 90.403, 90.801(1)(c), Fla. Stat. (1989).
The record in the instant case shows that Deputy Harkins testified that a teletype from Nebraska revealed that Peterka was an escaped fugitive and was considered "armed and dangerous." Defense counsel objected to the testimony as hearsay and irrelevant. The trial court overruled the objection because it found that the testimony was offered to explain the officer's actions in subsequently arresting Peterka. Defense counsel then moved for a mistrial because the testimony was highly prejudicial. The trial court denied the motion. The record supports the trial court's rulings that the testimony was not hearsay because it was not offered to prove the truth of the matter asserted and that the testimony was relevant. Moreover, the record shows that the trial court gave the jury a limiting instruction that the teletype testimony was being admitted not to prove the truth of the matter asserted, but to explain the actions of law enforcement officers. This limiting instruction eliminated any prejudice that may have resulted from the officer's testimony.
The fifth issue raised by Peterka is whether the trial court erred in admitting testimony that the victim suspected that Peterka had stolen a money order from him and *69 that the victim was going to let law enforcement handle the matter. Lori Slotkin, Kimberly Cox, and Deborah Trently testified that the victim did not intend to confront Peterka about the stolen money order because he was afraid of Peterka's gun and that the victim would let the police handle the matter after the bank received the original money order. In addition, Trently testified that the victim had a reputation for peacefulness in the community. Before each witness's testimony, the trial court gave the jury a limiting instruction that the witness's testimony was only offered to prove the victim's state of mind. Peterka argues that the trial court erred in admitting the testimony about the victim's state of mind because the prosecutor used the testimony to infer Peterka killed Russell in cold blood.
Generally, hearsay statements made by a victim in a homicide case showing that the victim is afraid of the defendant are not admissible under section 90.803(3), Florida Statutes (1989), because the victim's state of mind is not a material issue. Correll v. State, 523 So.2d 562, 565-66 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988); Charles W. Ehrhardt, Florida Evidence § 803.3a (1993 ed.). A homicide victim's statements may be material and admissible under the state of mind exception when: (1) the defendant claims self-defense and the victim's statements that he feared the defendant tend to rebut the claim; (2) the defendant claims the victim committed suicide and the defense can be rebutted by showing the victim's statements are inconsistent with suicide; and (3) the defendant claims the death was accidental and the defense can be rebutted by the victim's statements that he feared the instrument of death. Kingery v. State, 523 So.2d 1199, 1202 (Fla. 1st DCA 1988); Ehrhardt, § 803.3a.
The victim's state of mind was a material issue in this case where Peterka asserted that he accidentally shot the victim during a fight instigated by the victim. Thus, the trial court properly admitted the testimony to rebut Peterka's defense that the killing was accidental and to show that the victim feared the gun in the house.
Peterka argues that the trial court also erred in admitting a photograph of the victim's decomposed skull. During the medical examiner's testimony, defense counsel objected to the admission of photographs of the victim's decomposed body as highly prejudicial. Defense counsel and the prosecutor agreed to allow the medical examiner to use the victim's cleaned skull to explain the victim's wound. The trial court granted the defense motion to deny admission of the photographs. However, at the end of its case-in-chief, the State again sought to introduce photographs of the victim's skull on the basis that the photographs were relevant in light of the expert's testimony regarding the difficulty in determining the presence of gunpowder on decomposed tissue. Defense counsel again objected to the admission of the photographs because of their gruesome nature. The trial court sustained the defense counsel's objections as to four photographs, but admitted one photograph. Defense counsel also argued that the photograph did not show the body in the same condition as when the police found it because the medical examiner had removed tissue from the skull. The trial court denied the motion and admitted the photograph of the victim's decomposed skull into evidence.
On appeal, Peterka argues that the admission of the photograph violated his Sixth Amendment right to confrontation as he had no opportunity to cross-examine the medical examiner regarding the photograph. He also argues that any relevance of the photograph was outweighed by its highly prejudicial nature. Peterka did not specifically preserve the Sixth Amendment issue below. Bertolotti v. State, 565 So.2d 1343, 1345 (Fla. 1990). As to Peterka's relevance argument, we find the photograph relevant to the medical examiner's testimony that not enough tissue remained on the skull to determine the proximity of the gun to the victim's head. Thus, the trial court did not abuse its discretion in admitting the photograph into evidence. Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989). Moreover, even if we found that the trial court erred in admitting the photograph into evidence, *70 the error would be harmless. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).

Penalty Phase
Peterka argues that the sentencing order in the instant case is deficient because: 1) the trial judge failed to provide sufficient facts to support the finding of the aggravating circumstances; and 2) the trial judge failed to discuss and consider the mitigating circumstances shown at trial as required by Campbell. Section 921.141(3), Florida Statutes (1989), provides in part that "[i]n each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the [aggravating and mitigating circumstances] and upon the records of the trial and sentencing proceedings." As we stated in Hernandez v. State, 621 So.2d 1353 (Fla. 1993), "[t]he purpose of this requirement is to ensure that each death sentence handed down in Florida results from a thoughtful, deliberate, and knowledgeable weighing by the trial judge of all aggravating and mitigating circumstances surrounding both the criminal and the crime... ." 621 So.2d at 1357. Further, the trial judge's written findings should be unmistakably clear in order to provide a full appellate review. Mann v. State, 420 So.2d 578, 581 (Fla. 1982).
Although the sentencing order in the instant case was sparse, it sufficiently sets out the trial judge's factual findings and the aggravating circumstances. Thus, we find no merit to Peterka's first argument relating to the sentencing order. We also reject Peterka's contention that Campbell is applicable as the sentencing order in this case was entered before this Court's decision in Campbell, which we have held to be prospective only in application. Gilliam v. State, 582 So.2d 610, 612 (Fla. 1991). The sentencing order states that Peterka's lack of significant prior criminal history is a mitigating circumstance, but "[w]hile there was evidence tending to show other mitigating circumstances, the Court did not find any to exist." A review of the record also shows that the trial judge properly instructed the jury as to both the statutory and nonstatutory mitigating circumstances. The sentencing order, in conjunction with the trial court's instructions to the jury, indicates that the trial court gave adequate consideration to the mitigating evidence presented. Johnson v. Dugger, 520 So.2d 565, 566 (Fla. 1988).
Peterka contends that the State improperly presented testimony about his juvenile record during cross-examination of his mother in the penalty phase. On direct, Peterka's mother testified that he was close to his family, helped other people, and had "good" to offer others. On cross-examination, the State questioned the mother about Peterka's past adjudications in juvenile court. Defense counsel objected that the question went beyond the scope of direct examination. The trial court overruled the objection, and the State further questioned the witness about Peterka's arrests for burglary and adjudication as a delinquent. Defense counsel objected to the continued questioning on the ground that the witness had previously answered the question. In response to the court's inquiry at a side-bar conference, the State indicated that it did not have "certified copies" of the juvenile offense convictions, but did possess adult records that included a determination that Peterka had been adjudicated delinquent or its equivalent. The trial court ruled that Peterka had opened the door to questions regarding his juvenile record by placing his character at issue with his mother's testimony that he was a loving and caring child. Following the court's ruling, the State continued its cross-examination without objection.
Peterka now argues that the trial court improperly allowed the State to present testimony about unverified prior juvenile convictions. We find that the issue was not preserved as defense counsel did not specifically object on those grounds below. Although the record does not support the trial court's ruling that defense counsel opened the door for the State to offer rebuttal evidence of Peterka's character, the error was harmless. DiGuilio.
Next, we address the applicability of the aggravating circumstances found in the sentencing order. We first consider *71 whether the trial court properly found the aggravating circumstances of avoiding a lawful arrest and hindering the lawful exercise of a governmental function or enforcement of the laws. In order to find the avoid arrest aggravating circumstance "where the victim is not a law enforcement officer, the state must prove beyond a reasonable doubt that the dominant motive for the murder was the elimination of a witness." Correll, 523 So.2d at 567. The State has clearly met this burden and proved that the defendant committed the murder as part of a plan to avoid detection and eventual arrest for his crimes. The record supports the trial judge's finding that Peterka came to Florida as an escaped fugitive from Nebraska with the purpose of assuming a new identity. The contents of Peterka's wallet  a driver's license bearing Peterka's photograph but the victim's name and address; the victim's bank card, video-rental card, and Social Security card; and a newspaper clipping of jobs in Alaska  establish Peterka's intent to commit the homicide as part of a plan to establish a new identity. Further, there was testimony that Peterka told a friend shortly before the murder that "if everything went the way he wanted" he would be going up North soon. A woman that Peterka dated in Nebraska testified that shortly before fleeing Nebraska Peterka stated that his greatest fear was incarceration. In addition, had Peterka been arrested for theft of the money order, his identity would have been disclosed. The evidence proves beyond a reasonable doubt that Peterka killed the victim as part of a plan to avoid lawful arrest for the Nebraska charges.
Although the court properly found the avoid arrest circumstance, it erred in finding the hinder law enforcement circumstance to be a separate aggravating factor. The sentencing order shows that the trial court used the same features of the case to support both aggravating circumstances, which constitutes an impermissible "doubling" of aggravating circumstances. Bello v. State, 547 So.2d 914 (Fla. 1989). The trial court should have merged these two aggravating circumstances.
Next, we consider whether the trial court erred in finding the aggravating circumstance of pecuniary gain. This aggravating circumstance applies "only where the murder is an integral step in obtaining some sought-after specific gain." Hardwick v. State, 521 So.2d 1071, 1076 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 185, 102 L.Ed.2d 154 (1988). The trial court did not make any specific factual findings that would support this aggravating circumstance. Thus, we find that the trial court improperly considered the pecuniary gain aggravating circumstance.
Finally, we note that the record clearly supports the trial court's findings that Peterka committed the homicide while under a sentence of imprisonment and that he committed the homicide in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
Reversal of Peterka's death sentence is permitted only if this Court finds that the errors in weighing the aggravating and mitigating circumstances, if corrected, reasonably could have resulted in a lesser sentence. Robertson v. State, 611 So.2d 1228, 1234 (Fla. 1993); see also Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). If there is no likelihood of a different sentence, the error is harmless. DiGuilio. We find the trial court's errors in considering the pecuniary gain circumstance and "doubling" the avoiding lawful arrest and hindering law enforcement circumstances to be harmless. There are three valid aggravating circumstances remaining: 1) the homicide was committed while under a sentence of imprisonment; 2) the homicide was committed to avoid a lawful arrest and to disrupt or hinder the lawful exercise of a governmental function or the enforcement of the laws; and 3) the homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. In mitigation, the trial court found that Peterka had no significant criminal history. The record shows that this mitigating circumstance was based on the fact that Peterka's prior criminal convictions were nonviolent. Under the facts of this case, we find that the trial court would have imposed the *72 same sentence, and thus, the error in the sentencing order is harmless.
Accordingly, for the reasons stated in this opinion, we affirm Peterka's conviction for first-degree murder and his death sentence.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW, GRIMES and HARDING, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion.
KOGAN, Justice, concurring in part, dissenting in part.
This Court repeatedly has noted that the analysis developed in Campbell v. State, 571 So.2d 415 (Fla. 1990), was merely a continuation of principles first set forth in Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). Among the opinions indicating so are Ellis v. State, 622 So.2d 991, 1001 (Fla. 1993), Farr v. State, 621 So.2d 1368, 1369 (Fla. 1993), Foster v. State, 614 So.2d 455, 464-65 (Fla. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 398, 126 L.Ed.2d 346 (1993), Hall v. State, 614 So.2d 473, 478-79 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993), and Santos v. State, 591 So.2d 160, 164 (Fla. 1991). In Rogers, we stated:
If [mitigating] factors exist in the record at the time of sentencing, the sentencer must determine whether they are of sufficient weight to counterbalance the aggravating factors.
Rogers, 511 So.2d at 534 (emphasis added).
Because Rogers was decided before Peterka was tried, the court below had no authority to ignore any mitigating evidence established by the record. That clearly happened here. The trial judge's sentencing order offers virtually no support for his summary rejection of the available mitigating evidence, even though the judge acknowledges that "there was some evidence tending to show other mitigating circumstances." Moreover, I find this sentencing order too cursory to meet the requirements announced by Rogers or to be considered merely harmless error. Accordingly, I would vacate the trial court's order and remand for reconsideration and entry of a new order that fully complies with Rogers and its progeny. I concur as to the conviction.
NOTES
[1] § 921.141(5)(a), Fla. Stat. (1989).
[2] § 921.141(5)(e), Fla. Stat. (1989).
[3] § 921.141(5)(f), Fla. Stat. (1989).
[4] § 921.141(5)(g), Fla. Stat. (1989).
[5] § 921.141(5)(i), Fla. Stat. (1989).
[6] The Appellant filed a supplemental brief on this issue, but it is discussed in connection with issue two.
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).