829 So.2d 873 (2002)
Roger Lee CHERRY, Petitioner,
v.
Michael W. MOORE, etc., Respondent.
No. SC01-2862.
Supreme Court of Florida.
October 3, 2002.
*874 Michael P. Reiter, Capital Collateral CounselNorthern Region, and Linda McDermott, Assistant CCCNR, Tallahassee, FL, for Petitioner.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Respondent.
PER CURIAM.
Roger Lee Cherry petitions this Court for writ of habeas corpus. We have jurisdiction, see art. V, § 3(b)(9), Fla. Const, and deny the petition. While this is Cherry's *875 fourth appearance before us, this is his first petition for writ of habeas corpus.
Cherry was convicted for the 1986 murders of Ester and Leonard Wayne. See Cherry v. State, 544 So.2d 184 (Fla.1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1835, 108 L.Ed.2d 963 (1990). We affirmed both murder convictions. See id. at 186-87. We affirmed the death sentence imposed for Ester's murder; however, we reversed the death sentence imposed for Leonard's murder. See id. at 188. Because we reversed the death sentence imposed for Leonard's murder on proportionality grounds, there was no new penalty phase. The facts are more fully set forth in our opinion in Cherry's direct appeal. See id. at 185-86.
Subsequently, Cherry filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. No petition for writ of habeas corpus was filed at that time attacking the ineffectiveness of appellate counsel on the direct appeal.[1] The trial court denied relief without an evidentiary hearing. On appeal we affirmed the trial court with respect to most of Cherry's claims, but we remanded the claims related to allegations of trial counsel's ineffectiveness to the trial court for an evidentiary hearing. See Cherry v. State, 659 So.2d 1069 (Fla.1995). After a three-day evidentiary hearing, the trial court again denied relief, and we affirmed that denial on appeal. See Cherry v. State, 781 So.2d 1040 (Fla.2000), cert. denied, ___ U.S. ___, 122 S.Ct. 179, 151 L.Ed.2d 124 (2001).
Cherry now raises several claims and subclaims in his petition for writ of habeas corpus.[2] The habeas petition, in large measure, attacks appellate counsel's actions in prosecuting the direct appeal in the late 1980s. It was in the direct appeal that this Court affirmed the convictions, affirmed the death penalty for Ester Wayne's murder, vacated the death penalty for Leonard Wayne's murder on proportionality grounds, and directed a life sentence be imposed in lieu thereof.
Cherry's first claim centers upon the trial court's consideration and this Court's review of Dr. Barnard's psychiatric report, which was admitted into evidence during the penalty phase. This report has received much attention in our previous opinions. See Cherry, 544 So.2d at 186, 188; Cherry, 659 So.2d at 1074; Cherry, 781 So.2d at 1044-46, 1049-54. In his petition for writ of habeas corpus, Cherry now raises three subclaims concerning the report.
*876 In subclaim (1)(a), Cherry asserts that the trial court did not consider the psychiatric report and, in failing to do so, failed to consider mitigating evidence. Cherry further asserts that the trial court during postconviction and this Court on postconviction appeal failed to assess whether the trial court considered mitigation. We find this subclaim to be procedurally barred.
In its sentencing order, the trial court stated that the "mitigating circumstances were rejected by the Jury by the votes herein set forth." State v. Cherry, No. 86-4473-A, order at 3 (Fla. 7th Cir. Ct. order filed Sept. 26, 1987). The sentencing order also states, "The aggravating circumstances far outweigh mitigating circumstances in this cause." Id. On direct appeal, appellate counsel argued in point VIII of the initial brief that the trial court erred in failing to consider the psychiatric report as mitigating evidence. See Appellant's Initial Brief at 67-69, Cherry v. State, 544 So.2d 184 (Fla.1989) (No. SC71341). Indeed, appellate counsel asserted:
The alcohol and drug history portion of the psychiatric evaluation states: "[Cherry] said that in the year before his arrest he smoked about 5 or 6 joints of pot per day, and during the same period of time he smoked about $700 worth of `crack,' with the last being used on June 28, 1986." (R1168). The document further indicates that despite only a 10th grade education, Cherry has never been fired from any of his jobs, which included construction and hauling pulpwood (R1167). This information is clearly relevant; it is clearly mitigating. Cherry has no quarrel with the premise that a trial court can ascribe whatever weight it wants to mitigating evidence. The problem here is that the trial court did not even consider the evidence.

Id. at 67-68. In conclusion to point VIII, appellate counsel argued:
The failure of the trial court to consider the relevant mitigating evidence contained in the psychiatric report prior to the trial court's findings of fact, violated the [Eighth] and Fourteenth Amendments to the United States Constitution. Accordingly, the death sentence must be reversed and the matter remanded for resentencing.
Id. at 69.
While this Court on direct appeal indicated that Cherry raised eight challenges to the penalty phase, we only wrote at length about two and concluded the other six claims to be without merit. See Cherry, 544 So.2d at 187 ("Cherry's remaining eight challenges are directed to the penalty phase of his trial. We address two of these challenges and find the remainder meritless."). While we did not write separately concerning Cherry's point VIII, we did conclude that this direct appeal claim was meritless. Accordingly, the fundamental premise of Cherry's current habeas subclaim, i.e., the trial court did not consider the report, has previously been decided on the merits to the contrary. Thus, this claim is procedurally barred as it was raised on direct appeal. See Jones v. Moore, 794 So.2d 579, 583 n. 6 (Fla.2001).
Next, in subclaim (1)(b)(i), Cherry contends that appellate counsel was ineffective for failing to argue that the sentencing order did not contain specific written findings of facts as was required by section 921.141(3), Florida Statutes (1987). Cherry also submits as supplemental authority this Court's recent decision in Woodel v. State, 804 So.2d 316 (Fla.2001), to support his proposition that the sentencing order was deficient on this account.
Cherry's reliance upon Woodel is misplaced. Notably, Cherry does not cite Campbell v. State, 571 So.2d 415, 419-20 *877 (Fla.1990), which set forth guidelines concerning sentencing orders. As we have indicated, the Campbell requirement applied prospectively and did not apply to sentencing orders entered prior to our release of Campbell. See, e.g., Peterka v. State, 640 So.2d 59, 70 (Fla.1994). The sentencing order in the instant case was rendered and our decision in Cherry on direct appeal was released prior to our decision in Campbell. Our decision in Woodel was premised on Campbell. See Woodel, 804 So.2d at 326-27. While the sentencing order in this case is not as detailed as more recent sentencing orders, we were able on direct appeal and again during postconviction appeals to sufficiently discern and identify the issues surrounding the purported mitigation. Therefore, Cherry is unable to show prejudice and has failed to demonstrate appellate counsel's ineffectiveness. See Jones, 794 So.2d at 583 (noting habeas corpus ineffective assistance of appellate counsel standard mirrors Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), standard for trial counsel effectiveness). Accordingly, this subclaim is without merit.
Cherry's final contention of this claim, subclaim 1(b)(ii), is that appellate counsel was ineffective for failing to argue that a harmless error analysis is inappropriate after this Court strikes an aggravator for improper doubling. Cherry contends that appellate counsel should have argued that a reweighing of the aggravators and the mitigators was necessary. We conclude that this claim is procedurally barred.
On direct appeal, appellate counsel argued that the trial court improperly doubled two aggravators. See Appellant's Initial Brief at 20-22, Cherry v. State, 544 So.2d 184 (Fla.1989) (No. SC71341). The remedy for this situation, as argued by appellate counsel, was that the death sentence should be reversed and the issue remanded for imposition of a life sentence. See id. at 22. This Court agreed with appellate counsel that the trial court improperly doubled two aggravators but disagreed with the remedy. See Cherry, 544 So.2d at 187. In Cherry's motion for rehearing after this Court released its opinion on the direct appeal, appellate counsel argued the proper remedy was to vacate the death sentence and remand for a new penalty phase.
The issue in the current habeas subclaim was raised on direct appeal and decided on its merits; therefore this issue is procedurally barred. See Jones, 794 So.2d at 583 n. 6. To the extent Cherry now argues that the proper remedy was not a harmless error review, that contention is a variant to the issue decided on direct appeal and is procedurally barred. See id. at 586; Mann v. Moore, 794 So.2d 595, 602 (Fla. 2001).
In his second habeas claim, Cherry argues that appellate counsel was ineffective for failing to argue on appeal that (1) the trial court erred in excluding impeachment material; and (2) the trial court impermissibly allowed the prosecutor to bolster the credibility of a State witness, Lorraine Neloms. Cherry maintains that Neloms was the State's main witness and that she provided the foundation and bulk of the State's case against Cherry. Thus, according to Cherry, her credibility was paramount.
Specifically, Cherry contends that trial counsel attempted to impeach Neloms, who had been Cherry's girlfriend, with two alleged instances of domestic abuse committed by Ronnie Chamberlain upon Neloms. Chamberlain had previously been Neloms' boyfriend. One alleged instance of abuse constituted a felony; the other alleged instance of abuse constituted a misdemeanor. Trial counsel attempted *878 to introduce into evidence two documents: (1) a "Nolle Prosequi" filed after Chamberlain's successful pretrial diversion for the misdemeanor case; and (2) a "No Information" in which the assistant state attorney indicated that the beyond a reasonable doubt standard could not be obtained in the felony case because of Neloms' prior inconsistent statements concerning that alleged offense. The trial court ruled that these documents could not be entered into evidence. Cherry contends in his petition for writ of habeas corpus that Chamberlain had control over and motive to force Neloms to implicate Cherry in the murders, and therefore these two documents should have been admitted to assist in demonstrating the hold Chamberlain had over her.
Our review of an evidentiary objection made at trial but not raised by appellate counsel was described in Jones:
With regard to evidentiary objections which trial counsel made during the trial and which appellate counsel did not raise on direct appeal, this Court evaluates the prejudice or second prong of the Strickland test first. In doing so, we begin our review of the prejudice prong by examining the specific objection made by trial counsel for harmful error. A successful petition must demonstrate that the erroneous ruling prejudiced the petitioner. If we conclude that the trial court's ruling was not erroneous, then it naturally follows that habeas petitioner was not prejudiced on account of appellate counsel's failure to raise that issue. If we do conclude that the trial court's evidentiary ruling was erroneous, we then consider whether such error is harmful error. If that error was harmless, the petitioner likewise would not have been prejudiced.
794 So.2d at 583-84. Thus, under Jones, the first step is to review the trial court's specific ruling on the evidentiary question for error. For purposes of our consideration of the petition, we accept as fact that the two documents in question are what Cherry purports them to be.
The record reflects that the trial court, prosecutor, and trial counsel engaged in a significant discussion concerning the admissibility of the two documents and that the trial court excluded the two documents on "relevancy and materiality" grounds. "A trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion." White v. State, 817 So.2d 799, 805 (Fla.2002). We conclude that the trial court did not abuse its discretion in refusing to admit these two documents to impeach Neloms. Not only do these documents purportedly refer to criminal conduct of another (i.e., Chamberlain), the documents do not represent convictions of such person. Cf. id. at 806 (concluding that trial court did not abuse its discretion in excluding certain information related to another crime committed by the State's chief witness and codefendant in the case).
We likewise reject Cherry's alternative argument that the trial court should have allowed the "No Information" document into evidence because within the document it states that Neloms gave an inconsistent statement. Cherry acknowledges that when trial counsel asked Neloms about making a conflicting statement which led to the dismissal of the charges, Neloms testified that she did not remember making an inconsistent statement, and trial counsel did not continue to cross-examine her about the inconsistent statement. Instead, trial counsel successfully elicited from Neloms that Chamberlain had beaten her in the past. Trial counsel asked the following questions, to which Neloms gave the following answers:

*879 Q. [Chambers] was whipping up on you, wasn't he, Mrs. Neloms?
A. He used to.
Q. Why would you confide in a man who used to whip up on you, who you filed a charge with?
A. Because even though all that happened, he was a person that I can talk to.
Under the circumstances, we conclude that the trial court did not abuse its discretion in excluding the two documents. Certainly, the jury was aware that Chamberlain had dated Neloms and that he had previously beaten her. Thus, there was no need to admit these documents in an attempt to establish that to which Neloms had testified. Moreover, trial counsel questioned Neloms concerning her relationship with Chamberlain and explored her motivations for not sustaining charges against him. Even if we were to assume the assistant state attorney's assertion in the "No Information" was admissible hearsay, the document would have done little to assist Cherry's case. Accordingly, we conclude that Cherry has failed to demonstrate appellate counsel's ineffectiveness on the basis of choosing not to present these evidentiary rulings on appeal. See Jones, 794 So.2d at 583-84.
Cherry's next argument in his second claim is that appellate counsel should have objected to three instances of the prosecutor's attempting to bolster the credibility of State witness Neloms during the direct examination of Investigator Bradley. Cherry acknowledges that trial counsel objected to and the trial court sustained each of the three identified questions. Cherry now argues that trial counsel should have requested a curative instruction; however, appellate counsel cannot be ineffective absent fundamental error for failing to raise an issue not asserted by trial counsel. See Rutherford v. Moore, 774 So.2d 637, 646 (Fla.2000). Because the trial court sustained each of the complained of questions identified by Cherry, there was no adverse ruling from which appellate counsel could raise on appeal. Thus, review of this claim concerning the failure to request a curative instruction is for fundamental error, which is error that "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Spencer v. State, 27 Fla. L. Weekly S323, S329 (Fla. Apr. 11, 2002) (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960)).
The nature of the questions concerned whether the police were able to verify information Neloms gave to them. Investigator Bradley did not answer two of the questions prior to the trial court sustaining trial counsel's objections. The only question to which Bradley gave a complete answer was:
Q. Without going into the particulars that may have been provided, what action, if any, did you take to try to confirm any of those particulars or just the information in general that she provided?
A. The information itself that I was given left no doubt in my mind, you know, that there was something of substance to this lead.
MR. MILLER: Judge, I've got to object. The witness is vouching for the credibility of a witness and I would ask the jury
THE COURT: Don't say anything. Your objection is sustained.
MR. MILLER: Thank you, sir.
The jury only heard one complete offending comment. We conclude that the failure to request a curative instruction does not constitute fundamental error. See Spencer, 27 Fla. L. Weekly at S329.
*880 In his third claim, Cherry contends that several prosecutorial comments and arguments which were not raised on appeal constitute fundamental error. According to Cherry, the prosecutor committed error by commenting or arguing that (1) the victims were elderly; (2) Cherry is stupid and black; and (3) the jury's voting for the death penalty would demonstrate the jury's frustration with the legal system. The State contends that this claim is procedurally barred in that we concluded a similar claim to be procedurally barred in the 3.850 proceedings. See Cherry, 659 So.2d at 1071-72 n. 1. We reject the State's suggestion that this claim is procedurally barred. Although trial counsel did not lodge an objection to any of these three occurrences, we will review for fundamental error. See Rutherford, 774 So.2d at 646.
Turning to the merits of Cherry's third claim, we first review Cherry's contention that the prosecutor's remarking that the victims were elderly throughout the proceedings constituted impermissible victim impact evidence in violation of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and a nonstatutory aggravating factor. The victims were in fact elderly and the State may argue the facts in the record. The victim impact argument is misplaced and therefore without merit.[3] Similarly, the nonstatutory aggravating factor argument is meritless. We have examined the passages including the penalty phase closing and conclude that the prosecutor's argument did not constitute a nonstatutory aggravating factor. The passages referenced by Cherry do not constitute fundamental error.
Cherry also contends fundamental error occurred because the prosecutor called Cherry "stupid" and impermissibly injected racial bias into the proceedings. With regard to the "stupid" comment, Cherry cites to a passage during the State's cross-examination of Cherry.[4] A *881 review of this cross-examination passage reveals that the prosecutor only once commented that Cherry was stupid and on that occasion was immediately in response to Cherry's initial statement that the act under discussion, i.e., cutting oneself while cutting the head of a fish or a phone line, would be stupid. Cherry himself used the stupid comment no fewer than five times, before and after the prosecutor's sole comment. Moreover, Cherry does not indicate anywhere else in the record that the prosecutor commented that Cherry was stupid. We determine that the isolated comment does not constitute fundamental error.
With regard to the injection of the racial bias claim, Cherry points to a statement made by the prosecutor during guilt phase closing argument that Cherry "lives with a black female, lives in a house with other black individuals, [and] circulates in a black community." Cherry is black; the victims were white. During the trial, Florida Department of Law Enforcement microanalyst Marianne Hildreth testified that a hair fragment of African American origin found in the victims' bedroom was dissimilar to Cherry's hair. Hildreth also discussed the concept of transference and testified concerning how different individuals are able to transfer hair. In context, it is clear that the comment attacked by Cherry was simply the State's explanation why a hair fragment of African American origin but not Cherry's was found in the victims' bedroom, and the comment was not made to inject racial bias into the case.[5] We conclude that the prosecutor did not commit fundamental error by making the complained-of statement.
The final instance of fundamental error in claim three, according to Cherry, relates to the prosecutor's penalty phase *882 closing argument, in which the prosecutor stated:
The criminal justice system in this country is a frustrating thing. People feel that they have no control over it. They have no voice in it. That it just happens, that all the rights are the Defendant's rights or whatever. It doesn't work well, it's slow, it's whatever. And they really have no voice in the criminal justice system, they're frustrated. And on the few occasions when they do have a voice, it seems like nobody cares, nobody listens, nobody pays attention.
Today, ladies and gentlemen, each one of you individually and collectively have a unique opportunity in a situation. You have a voice in the criminal justice system. Not only do each of you have a voice, but that voice will be heard today.
We disagree with Cherry's arguments that Commonwealth v. Chambers, 528 Pa. 558, 599 A.2d 630, 644 (1991), and Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985), compel a conclusion that this passage constituted fundamental error. In Bertolotti, we found that three improper arguments which were more egregious than the instant passage did not constitute fundamental error.[6] We likewise conclude that the argument does not constitute fundamental error. See Spencer, 27 Fla. L. Weekly at S329.
Cherry's fourth claim is that appellate counsel failed to raise an instance of juror misconduct. Specifically, Cherry contends that an unidentified juror and one of the victims' daughters-in-law, Barbara Wayne, had a discussion during the trial, and because of this conversation, Cherry seeks a new trial. The State counters by explaining that the record reveals that the discussion occurred when the juror did not know that Wayne was a witness, no improprieties occurred, and the trial court properly handled the situation. While Cherry does not specifically identify the nature of the claim he is asserting, we review for fundamental error because trial counsel did not lodge any objection to the trial court's handling of this event.
The record reflects that jury selection occurred on September 21, 1987, with opening statements beginning the next day. The record from September 22, 1987, indicates that the prosecutor informed the trial court and defense counsel that Wayne might know one of the jurors. Out of the presence of the jury, the trial judge stated:
So the record will understand what we're talking about, earlier today the State Attorney advised the Defense Counsel and the Court that a witness may possibly know a juror and we had protected the sanctity of the record by reserving this time, in the absence of the jury, to address ourselves to that.
Thereafter, the trial judge allowed the attorneys to question Wayne concerning her brief contact with the juror. Wayne testified that while at lunch on September 22, she and the juror made eye contact. The juror motioned her over. They indicated to each other that they looked familiar and decided they knew each other through a bank. At that point, the juror asked Wayne if she was a witness, to which she responded in the affirmative, and the juror and Wayne immediately discontinued their contact. Wayne further testified that she used to be a bank branch manager at a bank where the juror was a customer, that she did not know the juror's name, and that she could not recall having any direct contact with the juror, who she *883 indicated was a male. Wayne testified that she would have remembered him if she had made him a loan, but she probably would not have remembered him if she had contact with him regarding bad checks.
After Wayne's proffered testimony, Cherry's trial counsel requested that counsel be allowed to further discuss this event with Cherry that evening. The trial court granted Cherry's request. The record from the next day does not indicate any further discussion of this issue, and nothing in the record indicates that trial counsel did not speak with Cherry. Indeed, there was no objection to the manner in which the trial judge conducted the inquiry, and there was no objection raised to this juror's further participation. Moreover, the record reveals that Wayne never testified before the jury. We conclude that these circumstances do not constitute fundamental error. See Spencer, 27 Fla. L. Weekly at S329, ___ So.2d at ___. We likewise reject Cherry's alternative suggestion that the record was incomplete and that on this basis we should reverse the convictions.
Having rejected all of Cherry's claims, we deny his petition for writ of habeas corpus.
It is so ordered.
SHAW, WELLS, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concur.
ANSTEAD, C.J., and PARIENTE, J., concur in result only.
NOTES
[1] In Mann v. Moore, 794 So.2d 595, 598 (Fla. 2001), we clarified that effective January 1, 2002, a capital defendant whose death sentence was finalized prior to January 1, 1994, was required to file a petition for writ of habeas corpus petition simultaneously with the initial brief appealing the denial of the rule 3.850 motion. In response and prior to January 1, 2002, many such capital defendants who previously had filed appeals to the denial of their 3.850 motions filed initial habeas corpus petitions.
[2] Cherry contends that (1) there was error in the trial court's consideration of Cherry's mitigation in that (a) the trial court failed to consider the psychiatric report, and (b) even if the trial court considered the psychiatric report, appellate counsel was ineffective for not arguing that (i) the sentencing order failed to discuss the mitigating circumstances, and (ii) the aggravating and mitigating circumstances should have been reweighed after this Court struck an aggravating circumstance on direct appeal; (2) appellate counsel should have argued that the trial court erred in excluding from evidence certain documents and that the prosecutor improperly bolstered a State's witness; (3) appellate counsel should have raised fundamental error relating to various prosecutorial comments and arguments; and (4) appellate counsel failed to argue juror misconduct.
[3] The Supreme Court of the United States overruled most of Booth in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). A review of the prosecutor's argument in the instant case reveals that the argument does not contain "a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence," which is an Eighth Amendment prohibition articulated in Booth which was not overruled by Payne. See Payne, 501 U.S. at 830 n. 2, 111 S.Ct. 2597. Thus, Cherry's reliance upon Booth is misplaced.
[4] Cherry points to the following exchange during the State's cross-examination of Cherry:

Q. Let's just pretend that this wire is a telephone wire, okay. You can cut your thumb the same way cutting a telephone wire, couldn't you?
A. If you're stupid enough to do something like that there.
Q. Well, you're stupid enough to cut your thumb cutting a fish, you could do it cutting a telephone wire, couldn't you?
A. I don't know what you're getting at, Mr. Marshall [the prosecutor].
Q. Well, I'm just saying that if you cut your thumb, basically, you've got the knife like this and the knife comes through and hits your thumb, right? If you're cutting through a fish or if you're cutting through a telephone wire, you cut your thumb the same way, don't you?
A. Well, a telephone wire is more thinner than a fish.
Q. Well, I agree with that, unless it's a needle fish or something. But what does that mean?
A. I'm just saying, you know, it would be highly, you know, stupid of someone if they're going to cut a phone line to grab the phone line and the knife and pull the knife through the phone line holding the phone line, that would be stupid, you know. Instead of just taking the knife and putting it on the phone line and snapping it, that would be stupid or just lay it up there and cut it, you know, just lay it down and cut it like this here, you know, that would be stupid.
[5] The entire argument relevant to this issue was:

The Defendant called several witnesses. The only witness that I think is really, that I would care to comment about, is the testimony of Marian Hildreth.
Ms. Hildreth is a crime lab analyst, also. She's an expert. Her field of expertise is microanalysis. Basically, you take hair or fiber fragments and you try to microscopically compare them to see if they are the same or similar.
She testified about finding Caucasian hair and animal hair and debris and sand and whatnot. The only thing that she really said that applies to this case would be the fact that she found one Negro hair fragment. And I stress that word, fragment, not an entire hair. In other words, the root was not attached to this Negroid hair. This was not a hair that was pulled out by the roots as if in a struggle, this was a piece of hair that was there in the bedroom. She was not able to tell which sex it was. She was not able to tell how long it had been there.
And, as a matter of fact, she explained to you how secondary transfer occurs. Everyone has probably heard the old joke or situation where the husband comes home late, the wife is upset and meets him at the door and she's really giving him the once over and there's the blonde hair on the lapel. Hey, buddy, where did you get that hair?
Well, obviously, it's not his hair. He doesn't have long blonde hair but he picked it up somewhere. These things do happen. These things do transfer. You get them in one place and you take them to another place.
The information before you is that Roger Cherry lives with a black female, lives in a house with other black individuals, circulates in a black community. The opportunity to pick up a Negro hair fragment is limitless as far as Roger Cherry is concerned. And I will indicate or stress to you one thing, that if you did, in fact, have some sort of secondary transfer occur and there was some sort of hair fragment on your clothing, that if you became involved in some sort of violent activity where you're punching someone or you're stomping someone, it's very likely that that hair fragment may drop off from your clothing.
(Emphasis added.)
[6] The three arguments in Bertolotti included the prosecutor's (1) commenting on the defendant's right to remain silent; (2) committing a "Golden Rule" violation by inviting the jury to imagine the victim's final pain, terror, and defenselessness; and (3) urging the jury to send a message to the community as a whole. See Bertolotti, 476 So.2d at 133.