[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 07-12363

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 2, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-00022-CV-SPM

DANIEL JON PETERKA,

Petitioner-Appellant,

versus

WALTER A. MCNEIL,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(July 2, 2008)

Before EDMONDSON, Chief Judge, ANDERSON and DUBINA, Circuit Judges.

ANDERSON, Circuit Judge:

Daniel Jon Peterka appeals the district court's denial of his federal habeas

petition in this death penalty case. According to the certificate of appealability that

we issued, the sole question on appeal is whether Peterka's trial counsel were

ineffective at the penalty phase.[1]  Peterka argues that his penalty-phase counsel were ineffective for failing to investigate and present three types of potentially mitigating evidence: (1) evidence concerning Peterka's military record; (2) evidence concerning Peterka's good prison behavior, including his failure to take advantage of an escape by his cellmates; and (3) evidence in the nature of his family relationships and good character.  For the reasons explained below, we affirm the district court's denial of Peterka's petition.

## I. STANDARD OF REVIEW

This Court reviews <u>de novo</u> the district court's denial or grant of a federal habeas petition sought under 28 U.S.C. § 2254.  <u>McNair v. Campbell</u>, 416 F.3d 1291, 1297 (11th Cir. 2005).  Nonetheless, pursuant to § 2254 as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we, like the district court, owe deference to the final state habeas judgment; accordingly, our review of the state ruling is "greatly circumscribed and highly deferential to the state courts."  <u>Stewart v. Sec'y, Dep't of Corr.</u>, 476 F.3d 1193, 1208 (11th Cir. 2007) (internal citation and quotation marks omitted).  Specifically, we may grant

---

[1]  Peterka's pro se motion to discharge counsel and expand the certificate of appealability is DENIED.

federal habeas relief for a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Stewart, 476 F.3d at 1208. Furthermore, we presume that the state courts' factual determinations are correct unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  Stewart, 476 F.3d at 1208.

Because Peterka has not challenged the state courts' determination of the facts, much less presented clear and convincing evidence to support such a challenge, the second prong – § 2254(d)(2) –  is inapplicable to our analysis.  Thus, to decide whether federal habeas relief is appropriate, we look to the first prong  – § 2254(d)(1) – under which the Supreme Court has explained that the writ may issue when either of two conditions are met:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the

3

facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000) (opinion of O'Connor, J., writing for a majority of the Court).

Regarding the "contrary to" clause, the Williams Court noted that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." Id. at 406, 120 S. Ct. at 1519. By way of example, the Court explained that if a state court applies a "preponderance" standard in a situation where precedent established that a "reasonable probability" standard governs, such a decision would be contrary to the Court's clearly established precedent. Id.

In contrast, if a state court identifies and applies the correct governing rule from the Supreme Court's cases, we look to the "unreasonable application" clause and examine "whether the state court's application of clearly established federal law was objectively unreasonable" given the facts of the particular prisoner's case. Id. at 407-08, 410, 120 S. Ct. at 1520-21. Notably, however, "an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." Id. at 412, 120 S. Ct. at 1523. Accordingly, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal

4

law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411, 120 S. Ct. at 1522.

## II. BACKGROUND

### A. The Crime, the Trial, and the Direct Appeal

The parties do not dispute the basic relevant facts regarding Peterka's shooting of his roommate, John Russell, or the facts regarding Peterka's trial and subsequent direct appeal. As such, we rely on the following version of the case from the Florida Supreme Court's opinion denying Peterka postconviction relief:

> Briefly stated, Peterka fled Nebraska in February 1989 after being sentenced to a one-year prison term for theft. He reappeared in Niceville, Florida, and sometime in April 1989, he moved into a rental duplex with Russell because Russell was having difficulty paying the rent. On June 27, 1989, Peterka obtained a duplicate driver's license with his picture and Russell's name. Peterka then cashed a $300 money order that was payable to Russell and had been mailed to Russell by a relative. Russell suspected that Peterka had stolen the money order but told several people that he was not going to confront Peterka, who kept a gun at the house.
>
> Russell was reported missing by his friend and co-worker, Gary Johnson, on July 13, 1989. Sheriff's Deputy Daniel Harkins questioned Peterka about Russell's whereabouts, and subsequently ran Peterka's name and birth date in the sheriff's office's computer, which indicated that Peterka was a fugitive from Nebraska with an outstanding warrant. Peterka was arrested early the next morning.
>
> On July 18, 1989, Peterka gave a statement to police in which he admitted shooting Russell. This Court[, the Florida Supreme Court,] summarized Peterka's statement as follows:

5

Peterka forged Russell's signature and cashed the money order. He paid Russell one hundred dollars to use Russell's identification. Russell instigated a shoving match over the money order that escalated into a fight in the living room of the duplex. Both men reached for Peterka's gun, but Peterka got it first. As Russell got up from the couch, the weapon accidentally fired and the bullet entered the top of Russell's head. Russell fell down on the couch. Peterka wrapped Russell's body in a rug, drove to a remote part of Eglin Air Force Base, and buried the body in a shallow grave.

Peterka subsequently led police to Russell's body and gave a videotaped statement similar to the statement he had given earlier. This videotaped statement was introduced into evidence at trial.

The medical examiner testified that Russell died from a close-range gunshot wound to the head and that the wound was consistent with Russell having been shot from behind while in a reclining position. A firearms expert testified that in his opinion Peterka's gun would not accidentally fire and that the gun had two safety mechanisms that would prevent it from firing unless the trigger was pulled.

The jury found Peterka guilty of first-degree premeditated murder. During the penalty phase, Peterka presented the testimony of friends and family members to establish mitigation. Collectively they testified that Peterka is a good brother and son, is caring and understanding, is an excellent, responsible employee, and is always helpful. Peterka also testified on his own behalf, stating that he feels he has something to share with society and that if he could bring Russell back he would be glad to give his life. At the conclusion of the penalty phase, the jury recommended the death penalty by a vote of eight to four.[2] After weighing the aggravating and mitigating circumstances, the trial court

---

[2] A majority (seven) of the twelve jurors must either recommend life or death at sentencing, and a tie is construed as a recommendation for life. Bush v. Singletary, 988 F.2d 1082, 1089 (11th Cir. 1993) ("If a majority does not vote for death, the jury's recommendation is life; therefore, if the jury's vote is six to six, the recommendation is one for life."); see also Fla. Stat. § 921.141(3) (1990).

followed the jury's recommendation and sentenced Peterka to death.[3]

Peterka v. State (Peterka II), 890 So. 2d. 219, 225-26 (Fla. 2004) (internal citations omitted) (first footnote added).

On direct appeal, the Florida Supreme Court "concluded that the trial court erred by (1) allowing the State to present evidence of Peterka's juvenile record during the penalty phase, (2) failing to merge the hinder law enforcement aggravator with the avoid arrest aggravator, and (3) finding the pecuniary gain aggravator." Id. at 226-27 (citing Peterka v. State (Peterka I), 640 So. 2d 59, 70-71 (Fla. 1994)). However, the supreme court "further concluded that these errors were harmless and affirmed Peterka's conviction and sentence." Id. at 227 (citing Peterka I, 640 So. 2d at 72-73).

B. Peterka's State and Federal Collateral Appeals

Following his direct appeal, Peterka filed a motion for postconviction relief under Florida Rules of Criminal Procedure 3.850 and 3.851, in which he raised numerous claims, including allegations of ineffective assistance of trial counsel.

---

[3] The trial court found the following five aggravating circumstances: (1) the murder was committed while Peterka was under a sentence of imprisonment; (2) the murder was committed for the purpose of avoiding or preventing lawful arrest; (3) the murder was committed for pecuniary gain; (4) the murder was committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws; and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. In mitigation, the trial court found the statutory mitigator that Peterka had no significant history of prior criminal activity but found no nonstatutory mitigation.

Peterka specifically argued that his penalty-phase counsel's performance was deficient because counsel failed to adequately investigate or present to the jury certain mitigating evidence, including evidence of Peterka's military record, of his good behavior during pretrial incarceration, and of his good character traits. The state circuit court held an evidentiary hearing on these allegations of ineffective assistance, and at the hearing, Peterka presented the following relevant evidence.

Peterka's mother, father, sister, and brother testified regarding Peterka's military service, his relationships with family, and his history of good deeds and nonviolent behavior. In particular, Peterka's mother testified that she had in her possession at the time of trial copies of two commendations recognizing Peterka's outstanding leadership while in the national guard. She further testified that had trial counsel told her that the commendations might be useful mitigation evidence, she would have provided the documents, but that counsel had never asked her to bring anything other than a photo album.

Peterka also presented the testimony of Allen Atkins, a lieutenant with the Okaloosa County Jail. Atkins testified regarding Peterka's good behavior during his pre-trial incarceration, characterizing Peterka as a "little better" than the normal inmates who were charged with murder or were considered violent. However, Atkins could not recall any specific behavior or incident that would make Peterka

8

any different than any other inmate "trying to act properly."

In addition, Peterka testified in his own behalf about his military record and his good behavior in jail. Regarding his military record, Peterka specifically noted that while in the national guard, he had been chosen as a platoon leader and had received two commendations, including one for leadership. Regarding his prison record, Peterka highlighted his lack of disciplinary reports while in jail and the fact that after the jury recommended death, but before the court issued its ultimate sentence, he remained in his cell for approximately twelve hours after his cellmates had escaped. Peterka further testified that during a twenty-minute preparation for his penalty phase, counsel never asked him about his military history or his conduct during his pretrial incarceration. Peterka did admit, however, that he never told his attorneys about the escape attempt because he assumed they had heard about it.

In rebuttal, the State presented the testimony of Peterka's trial counsel, Assistant Public Defenders Earl D. Loveless and Mark V. Harllee,[4] and Investigator James W. Graham. Because Peterka's file was destroyed in a flood, Loveless, Harllee, and Graham were unable to review their notes on Peterka's case

---

[4] Loveless served as lead attorney, but Harllee, who was relatively inexperienced at the time, conducted the penalty phase after being second chair during the guilt phase. Loveless, however, testified that the preparation for each phase was handled equally with both attorneys involved.

and testified based solely on their independent recollections of what occurred at trial twelve years earlier. All three testified that they were sure they were aware of Peterka's military service because the office used a standard questionnaire that inquired about it, but they were unsure whether they knew of Peterka's commendations. Harllee explained that he likely chose not to present the military service evidence because he feared that the prosecutor would tear apart such evidence given the fact that Peterka had been discharged as a result of the felony charges he was facing in Nebraska. Although the Nebraska crimes were unrelated to Peterka's military service, and were committed while Peterka was off duty, Harllee believed that highlighting the military evidence would negatively impact Peterka's case if the jury believed that Peterka had besmirched the military. Harllee further testified that he still would not present the military service evidence today. Loveless, however, testified that had he known about the commendations, he would have used that evidence regardless of the circumstances surrounding Peterka's discharge. Likewise, Graham testified that if he knew about the commendations, he likely would have advised the attorneys to use them as mitigating evidence.

Furthermore, regarding Peterka's prison record, Harllee stated that it is something defense counsel "would have investigated," and Graham believed that

he would have spoken to some of the officers at the jail about Peterka's behavior. Harllee testified that there is not really a downside to presenting evidence of good behavior while in jail and that he likely would have presented such evidence if he had it. Loveless agreed that they would have investigated such prison-record evidence and that they would have considered using it, but he noted that he had never had a case where he chose to present such evidence, and he explained that "he had doubts about how it's received by a jury." Finally, when asked why he presented certain good-character letters only to the judge without submitting them to the jury and without producing live witnesses, Harllee was not sure why that decision was made, but he noted that several of the letter writers lived far away from the site of the trial.

Ultimately, the state trial court denied Peterka's motion for postconviction relief, and the Florida Supreme Court affirmed the denial while also denying state habeas relief. Regarding Peterka's claim that trial counsel were ineffective for failing to investigate and present evidence of his military background, the Florida Supreme Court explained its ruling as follows:

> Although Peterka testified at the evidentiary hearing that he was never asked about his military record, Harlee [sic] testified that he believed he had been apprised of Peterka's military service, and both Loveless and Investigator Graham testified that they knew Peterka had military experience. Moreover, both Graham and Loveless testified that

11

the penalty phase form used by the Public Defender's Office in the regular course of business in 1989 had a space for military background. Thus, there is competent, substantial evidence to support the trial court's finding that trial counsel asked Peterka about and was aware of Peterka's military history.

There is also competent, substantial evidence to support the trial court's finding that trial counsel made a reasoned tactical decision not to present this evidence in mitigation. Harlee [sic] testified that in this case there was a "negative" side to the military service mitigation because Peterka's illegal conduct led to his discharge from the National Guard. Harlee [sic] believed that because the trial was being held in "a very heavy military area," Peterka's conduct could be viewed as "besmirching the name of the military." Fearing that the prosecutor would "come back and destroy" it if Peterka's military service was highlighted, Harlee [sic] decided not to pursue this mitigation. Thus, Harlee's [sic] tactical decision not to focus on Peterka's military service as a mitigating circumstance was not deficient performance.

Peterka II, 890 So. 2d at 237.

Regarding Peterka's claim that his trial counsel were ineffective for failing to uncover and present mitigating evidence of Peterka's good behavior in jail and his refusal to participate in an escape, the Florida Supreme Court expressly declined to rule whether Peterka's counsel's performance was deficient in this regard. Id. at 237. Instead, the court ruled that even if counsel were deficient, their performance did not result in prejudice. Id. Although the supreme court chose not rule on the performance prong, the state postconviction trial court had ruled on this aspect, holding that trial counsel did not render ineffective assistance for failing to present evidence of model jail conduct in mitigation.

12

Finally, regarding Peterka's claim that trial counsel were ineffective for failing to present evidence of his relationships with his family, his good, helpful nature, and his nonviolent past, the Florida Supreme Court explained its ruling as follows:

> The record supports the trial court's finding that much of the evidence presented at the evidentiary hearing was cumulative to the evidence presented by counsel at trial. Further, Peterka's father was unable to testify at trial because he was having symptoms of a heart attack during that time and Peterka's mother testified at the evidentiary hearing that she would not have wanted Peterka's siblings exposed to the trial because of their ages at that time. Thus, trial counsel were not ineffective for failing to have these witnesses testify.

Id. at 237-38.

After the Florida courts denied him collateral relief, Peterka challenged the Florida courts' rulings by seeking a writ of habeas corpus in federal court. The district court denied Peterka's federal habeas petition, agreeing with the Florida courts that Peterka had failed to establish that his counsel were ineffective at the penalty phase of his trial. This appeal followed. We now affirm the district court's denial because we conclude that the Florida Supreme Court's decision, insofar as it held that there was no deficient performance, is neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. As to the one sub-issue with respect to

13

which the Florida Supreme Court pretermitted the performance prong, we conclude after <u>de novo</u> review that the performance of Peterka's counsel was not deficient.

## III.  DISCUSSION

The Florida courts correctly identified <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), and its progeny as the relevant Supreme Court decisions governing Peterka's claims of ineffective assistance of counsel.  To obtain relief under <u>Strickland</u>, a habeas petitioner must show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense."  <u>Id.</u> at 687, 104 S. Ct. at 2064.  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  <u>Id.</u> at 687, 697, 104 S. Ct. at 2064, 2069.  Without reaching the prejudice prong, we sustain the state courts' rulings that Peterka's counsel's performance was not deficient.

Under the "performance" prong, "a defendant must show that counsel's representation fell below an objective standard of reasonableness" considering all the circumstances.  <u>Id.</u> at 687, 104 S. Ct. at 2064-65.  To establish such deficient performance, a defendant bears a substantial burden because courts "must indulge a strong presumption that counsel's conduct falls within the wide range of

14

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 689, 104 S. Ct. at 2065. Because "[t]here are countless ways to provide effective assistance in any given case," our review of counsel's performance is "highly deferential" in an attempt to avoid "the distorting effects of hindsight." Id.

Applying these principles, the Strickland Court directly addressed claims similar to those in this case – i.e., claims that counsel failed to adequately investigate and present mitigating evidence at trial. Id. at 678, 690, 104 S. Ct. at 2059-60, 2066. The Court explained that

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91, 104 S. Ct. at 2066. Furthermore, the Court stressed that

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by

15

the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 691, 104 S. Ct. at 2066.

In Strickland, the Court ultimately ruled that the defendant-respondent failed to establish deficient performance by his counsel. Id. at 699, 104 S. Ct. at 2071. Although counsel chose not to investigate or present all character and psychological evidence that was available, these strategic choices were "well within the range of professionally reasonable judgments" for multiple reasons. Id. at 699, 104 S. Ct. 2070-71. Among other things, "[t]rial counsel could reasonably surmise from his conversations with respondent that character and psychological evidence would be of little help." Id. at 699, 104 S. Ct. at 2071. In addition, "[r]estricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude,

16

would not come in." Id.

In contrast to the result in Strickland, the Court in Wiggins v. Smith ruled that defense counsel's choice to limit their investigation into their client's background failed to meet Strickland's performance standards. Wiggins, 539 U.S. 510, 524-26, 533-34, 123 S. Ct. 2527, 2536-37, 2541-42 (2003). The Wiggins Court explained that the limited scope of counsel's investigation was unreasonable in light of the evidence that counsel had discovered concerning their client's extensive childhood abuse. Id. at 525, 123 S. Ct. at 2537. The investigation constituted deficient performance because "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." Id. at 527-28, 123 S. Ct. at 2538. However, the Court "emphasize[d] that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Id. at 533, 123 S. Ct. at 2541. Furthermore, the Court explicitly distinguished its ruling from earlier cases in which it had found limited investigations into mitigating evidence to be reasonable, noting that here "counsel uncovered no evidence in their investigation to suggest that a mitigation case, in its own right, would have been counterproductive, or that further investigation would have been fruitless." Id. at

17

525, 123 S. Ct. at 2537.

## A. Evidence of Peterka's Military Record

Both the lower state collateral court and the Florida Supreme Court found as a fact that Peterka's counsel were aware of his military service and that the decision not to present the military evidence was a reasoned tactical decision. Peterka's trial took place in an area with a strong military presence, and Peterka had received a "general" discharge rather than an "honorable" one as a result of his Nebraska crimes. Given that the prosecution could use Peterka's Nebraska crimes and his resulting discharge to rebut any claims that Peterka had a good military record, counsel's decision not to highlight this evidence as potential mitigation does not fall below an objective standard of reasonableness considering all the circumstances.

Although counsel failed to uncover Peterka's commendations, counsel knew about Peterka's military service and knew about the circumstances surrounding Peterka's discharge. Counsel is not required to investigate every conceivable line of mitigating evidence, and nothing that Peterka had revealed about his military service suggested that other facts might outweigh the negative aspects surrounding his discharge. Like in Strickland, and in contrast to Wiggins, Peterka's counsel could reasonably conclude that further investigation would have been fruitless or

even counterproductive. Counsel's decision to limit their investigation into Peterka's military record falls within the wide range of professionally competent assistance. Certainly, the state courts' rulings with respect to the military evidence are not contrary to, or an unreasonable application of, Strickland, Wiggins, or any other U.S. Supreme Court precedent.

B. Evidence of Peterka's Prison Behavior

With respect to Peterka's argument that his counsel were ineffective for failing to investigate and present evidence of Peterka's good conduct in prison, including his declining to take advantage of the opportunity to escape with his cellmates, the Florida Supreme Court pretermitted ruling on the performance prong and held only that no prejudice resulted from counsel's decisions. However, the lower state collateral court held that counsel were not deficient in this respect. We need not decide whether we owe AEDPA deference to the state trial court's legal conclusion in this circumstance because we readily conclude that even under de novo review, Peterka's counsel's performance was not deficient in regards to the evidence of prison behavior.

Peterka's counsel's investigation into his prison record and their decision not to present such evidence to the jury were reasonable. Harllee, Loveless, and Graham all testified that they would have looked into Peterka's prison behavior,

19

and at any rate, evidence of Peterka's good prison behavior was minimal at best. Lieutenant Atkins testified that Peterka was a "little better" than the normal person who had been incarcerated for a violent crime, but Atkins did not testify that Peterka was a model inmate. The mere fact that Peterka was "trying to act properly" does not present compelling mitigating evidence that every reasonable attorney would present to the jury.

As for the alleged escape opportunity, although it would have constituted mitigating evidence if believed by the jury or sentencing judge, Peterka's counsel were never aware of the relevant events, which occurred after the jury had recommended death but before the judge had imposed a final sentence. Peterka's counsel had investigated for the penalty phase prior to trial. Even assuming they had a duty to explore further mitigation at this mid-trial stage, counsel would have reasonably expected Peterka to have advised them if something like the escape opportunity occurred. The Supreme Court made clear in Strickland that the reasonableness of counsel's strategic decisions, particularly those concerning the scope of investigation, often depends critically on information provided by the defendant. Peterka should have known by this time that this was the kind of evidence that his attorneys would have been interested in – i.e., the kind of evidence that could be used as mitigation. After all, Investigator Graham testified

that before the penalty phase, Peterka filled out a second questionnaire with a space for prison conduct. In light of these facts, we conclude that Peterka's counsel's investigation into his prison record and their strategic decisions not to present such evidence fall within the wide range of reasonable professional assistance.[5] Accordingly, the state courts' holdings that Peterka failed to establish ineffective assistance in this respect are neither contrary to, nor an unreasonable application of, clearly established federal law.

### C. Evidence of Peterka's Good Character

With respect to Peterka's argument that his counsel were ineffective by failing to investigate and present additional evidence of his loving family relationships and good character, we again agree with the state courts that Peterka failed to establish deficient performance. During the penalty phase, counsel presented evidence through the testimony of Peterka's mother that Peterka was a loved and loving member of his family, that he was kind to others and animals, and that he was a good person. Counsel introduced a photo album to illustrate these assertions. Furthermore, two other witnesses testified about Peterka's loving

---

[5] Alternatively, after careful review of the totality of the evidence that was properly considered by the Florida Supreme Court, we cannot conclude that the Florida Supreme Court's holding on this issue – i.e., that "Peterka has failed to establish the prejudice prong," Peterka II, 890 So. 2d at 237 – is contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

relationship with his family, his gentle and caring nature, and his good deeds and charitable acts. Although other witnesses could have provided additional testimony along the same lines, many lived far from the site of the trial, and Peterka's father was too ill and his siblings too young to testify. The decision not to seek out additional witnesses of Peterka's good character does not constitute deficient performance, and the state courts' conclusions in this respect are neither contrary to, nor an unreasonable application of, relevant Supreme Court cases.

Accordingly, the district court's order denying Peterka's federal habeas petition is AFFIRMED.