[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12883

_____

STEVEN RICHARD TAYLOR,

Petitioner-Appellant,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:12-cv-00444-BJD-MCR

_____

Before WILSON, JILL PRYOR, and NEWSOM, Circuit Judges.

NEWSOM, Circuit Judge:

More than 30 years ago now, a Florida jury convicted Steven Richard Taylor of first-degree murder, burglary of a dwelling, and sexual battery. He was sentenced to death for the murder, 15 years' imprisonment for the burglary, and 27 years for the sexual battery. After exhausting state remedies, Taylor sought habeas corpus relief in federal court, alleging (as relevant here) various evidentiary errors at his trial. The district court denied Taylor's habeas petition, and he now appeals. We affirm.

I

The facts of Taylor's case, as recounted by the Florida Supreme Court, are as follows:

On September 15, 1990, at about 11:30 p.m., the victim, fifty-nine-year-old Alice Vest, returned to her mobile home in Jacksonville after spending the evening with a friend. Earlier that evening, the appellant, Steven Richard Taylor, and two friends were out driving and listening to the radio. Around midnight, the driver of the car dropped off Taylor and his friend, who was later to become his accomplice, near the victim's neighborhood.

Sometime in the early morning hours of September 16, a Ford Ranchero was stolen from a residence near the place where Taylor had been dropped

> off. At about 4:30 a.m., after the vehicle had been stolen, a passing motorist noticed the Ford Ranchero parked in a driveway next door to the mobile home where the victim lived. Later that morning, the Ford Ranchero was found abandoned behind a used car dealership only a few blocks from where Taylor lived at the time.
>
> On the same morning, neighbors discovered the victim's battered body in the bedroom of her mobile home. . . .
>
> . . . .
>
> The testimony at trial also revealed that the phone line to the mobile home had been cut, that the home had been burglarized, and that various pieces of jewelry were missing.

*Taylor v. State*, 630 So. 2d 1038, 1039 (Fla. 1993) (per curiam) (*Taylor I*).

The police didn't immediately know who was responsible. Subsequent events added to their suspicion and, eventually, led to Taylor's arrest:

> In December of 1990, Taylor moved out of the duplex he had been sharing with a friend. In January, 1991, while Taylor's former roommate was removing a fence behind the duplex, he discovered a small plastic bag buried in the ground near the fence. The bag contained the pieces of jewelry taken from the

victim's home during the attack and burglary. The roommate turned the jewelry over to the police and gave a statement. Later that month, Taylor visited the duplex with some friends. The former roommate testified that, at some point during the visit, Taylor went into the backyard and stared at the place where the fence had stood. During the following month, Taylor again returned to the duplex with friends. One of the accompanying friends testified that Taylor went into the backyard and returned a few minutes later with dirty hands. In response to the friend's inquiry as to what he was doing, Taylor allegedly responded that he had left some things there and that they were gone.

On February 14, 1991, the Duval County sheriff's office executed a search warrant on Taylor which authorized the officers to take blood, saliva, and hair samples from Taylor. Taylor was taken to the nurses' station at the county jail so that the samples could be taken, but not before Taylor invoked his right to counsel. Later that day, after the samples were taken, Taylor asked the investigating officer how long it would take to get the results back. Instead of directly responding to the question, the investigating officer asked Taylor why he wanted to know. Taylor responded that he was just wondering when they would be back out to pick him up. Taylor did not have long to wait. Two days later, on February 16, Taylor was arrested, and, on March 3, a grand jury returned a two-count indictment against Taylor for

first-degree murder and burglary.  The indictment
was amended on September 12, 1991, to add a third
count for sexual battery.

*Id.* at 1039–40.

At trial, the state presented the evidence of Taylor's location
on the night of the murder, testimony tying him to the bag of jewelry, and DNA evidence from the scene that matched his profile.
With respect to the latter, Dr. James Pollock, a Florida Department
of Law Enforcement (FDLE) lab analyst who was "an expert in serology . . . testified that semen found in the victim's blouse matched
Taylor's DNA profile." *Id.* at 1040.  Taylor's attorney, Frank Tassone, presented only one witness, an FBI agent who testified that
some of the physical evidence matched Taylor's accomplice.  *Id.*
Taylor was convicted of first-degree murder, burglary of a dwelling, and sexual battery and was subsequently sentenced to death.

Taylor sought state postconviction relief under Florida Rule
of Criminal Procedure 3.850(a), and the state court granted an evidentiary hearing.  As relevant for our purposes, Taylor presented
the testimony of the state prosecutors, his trial counsel, his first
post-conviction attorney, Shirley Zeigler (a former FDLE DNA analyst who served as the "second looker" for Dr. Pollock's DNA
analysis results), and Dr. Randell Libby (a DNA expert).  The Florida Supreme Court described Taylor's DNA-related case this way:

> To challenge the DNA evidence presented
> against Taylor at trial, the defense presented Dr.
> Libby to address alleged problems associated with Dr.

6                    Opinion of the Court                    21-12883

> Pollock's State testing procedures. Dr. Libby testified that the FBI DNA testing protocol utilizes five to eight probes, but Dr. Pollock's State testing only utilized four. Further, Dr. Libby opined that three of the four probes utilized by Dr. Pollock were inconclusive. One reason Dr. Libby used as a predicate for concluding that the probes were inconclusive was due to differences in the [] reports created by Dr. Pollock and Shirley Zeigler. The defense also presented Shirley Zeigler, who worked as a[n FDLE] analyst at the time the DNA evidence was processed. Zeigler's initials were found on the calculated fragment report that was used by Dr. Pollock at Taylor's initial trial. Zeigler testified that she would have found two of the probes utilized by Dr. Pollock to be inconclusive, but did not disagree with Dr. Pollock's ultimate findings.

*Taylor v. State*, 62 So. 3d 1101, 1107 (Fla. 2011) (per curiam) (*Taylor III*).

As relevant here, the state postconviction court found that Dr. Libby's testimony wasn't credible: Dr. Libby, the court found, lacked "the requisite background and experience in forensic DNA" to warrant giving his testimony considerable weight. *State v. Taylor*, 2009 WL 9419304, at *6 (Fla. Cir. Ct. June 22, 2009) (*Taylor II*). It denied Taylor's petition, and the Florida Supreme Court affirmed.

Taylor petitioned for federal habeas corpus relief in the Middle District of Florida in April 2012. *See* 28 U.S.C. § 2254. The

district court denied his petition in May 2021 without holding an evidentiary hearing. *See Taylor v. Secretary, Fla. Dep't of Corr.*, 2021 WL 2003122, at *1–2, *26 (M.D. Fla. May 19, 2021) (*Taylor IV*).

Taylor sought a certificate of appealability, which we granted on five issues:

1. Did the state violate *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose Dr. Pollock's deviations from the FDLE and FBI DNA testing protocols—namely, his testing of only four DNA probes, his testimony that DNA probes D4S139 and D1S7 matched Taylor's DNA profile, and his interpretation of over 10,000 DNA base pairs?

2. Did the district court err in applying the *Brecht v. Abrahamson*, 507 U.S. 619 (1993), harmless-error test to Taylor's above-referenced *Brady* claim?

3. Did Taylor's trial counsel provide ineffective assistance, pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to challenge the state's DNA evidence under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)?

4. Did Taylor's trial counsel provide ineffective assistance, pursuant to *Strickland*, by failing to request a hearing under *Richardson v. State*, 246 So. 2d 771 (Fla. 1971), upon learning of Zeigler's identity at trial during Dr. Pollock's cross-examination?

5.  Did the district court err in holding that Taylor
    was not entitled to suppression of the statements
    he made to Officer John Bogers under *Miranda v.
    Arizona*, 384 U.S. 436 (1966)?

We now address those issues in turn.

## II

We review the district court's denial of a federal habeas petition under 28 U.S.C. § 2254 de novo. *Peterka v. McNeil*, 532 F.3d 1199, 1200 (11th Cir. 2008). But under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), review of the underlying state-court decisions is highly deferential. *Williams v. Allen*, 598 F.3d 778, 787 (11th Cir. 2010). In particular, we must honor a state court's merits-based denial of a habeas claim unless its decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Moreover, when considering whether a state court's decision was based on an "unreasonable determination of the facts," we presume that all of that court's factual determinations are correct, and the defendant bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

### III

We'll work our way through the DNA-related issues—the first four of the five issues teed up by the COA—before turning to the *Miranda* issue.

### A

To establish a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), a criminal defendant must show (1) that the prosecution possessed evidence "favorable" to him, which can include evidence with impeachment value; (2) that he didn't possess the evidence and couldn't have obtained it with due diligence; (3) that the prosecution suppressed the evidence; and (4) that, if the evidence had been disclosed to the defendant, it is reasonably probable that the outcome of his proceeding would have been different. *United States v. Gallardo*, 977 F.3d 1126, 1142 (11th Cir. 2020).

Taylor argues that the state violated *Brady* by withholding information about Dr. Pollock's deviations from FBI DNA-testing protocols. The Florida Supreme Court disagreed, holding that information about protocol deviations wasn't material—that it wouldn't have led to a different outcome at trial. Applying the requisite ADEPA deference, we agree. Accordingly, we needn't address the state's contentions that Taylor also hasn't met *Brady*'s suppression and diligence prongs.[1]

---

[1] We also needn't address the second issue on which we granted a COA, Taylor's *Brecht* argument. The district court couldn't have made a prejudicial

It is not reasonably probable that the disclosure of Dr. Pollock's protocol deviations would have changed the result at trial because it wouldn't have changed either the evidence available to the jury or Tassone's trial strategy.  Taylor's case at trial covered the protocol deviations.  For example, Dr. Pollock mentioned in his trial testimony "very minor modifications" to the FBI protocol and the "very weak" and "very difficult to see" bands in his results—plenty for Tassone to use against Dr. Pollock at trial.  In fact, Tassone cross-examined Dr. Pollock about the faintness of the bands.  Tassone also probed Dr. Pollock about his methods—including the procedures from which the alleged deviations stemmed.

Even if Tassone had introduced other evidence following a disclosure, a reasonable jurist could conclude that it wouldn't have made a difference to the jury.  Dr. Goldman—Taylor's DNA expert—reviewed Dr. Pollock's report before trial and didn't "have any major complaints" about his DNA analysis.  And none of the protocol-deviation evidence presented in the evidentiary hearing challenging Dr. Pollock's four-probe identification changes our conclusion.  The only evidence that contradicted Dr. Pollock's identification based on the four probes (as opposed to five to eight) and the use of probes outside a specific size range was Dr. Libby's testimony:  Dr. Pollock's identification, he said, could have been

_____

error in evaluating whether there was a harmless *Brady* error if, as we conclude, there was no *Brady* error.

flawed or, at the very least, should have been deemed inconclusive. But not even Dr. Libby said that Dr. Pollock's identification was wrong—*e.g.*, that he misread a band or botched the matching process. He merely said that Dr. Pollock *shouldn't have drawn a conclusion* from the testing. Either way, the state court explicitly found that Dr. Libby wasn't credible. *Taylor II*, 2009 WL 9419304, at *6. Absent clear and convincing evidence to the contrary, we must respect the state court's decision to credit Dr. Pollock and discredit Dr. Libby.

Taylor also points to Ziegler's testimony to challenge Dr. Pollock's use of two particular probes to declare a DNA match to Taylor. While Zeigler didn't dispute Dr. Pollock's findings, she testified that it was a violation of protocol to conclude, as he did, that these two probes were conclusive. But as already explained, Dr. Goldman reviewed Dr. Pollock's report, which included Dr. Pollock's findings and conclusions, and didn't take issue with any part of it.

Accordingly, the district court was right to hold, under AEDPA's deferential standard, that the Florida Supreme Court reasonably concluded that there was no *Brady* violation.

## B

Taylor next contends that Tassone provided ineffective assistance at trial in two respects. Ineffective-assistance claims are governed by the framework established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under that framework, a defendant must

prove both (1) that his counsel performed in a constitutionally deficient manner and (2) that he suffered prejudice as a result. *Id.* at 687.

## 1

Taylor first asserts that Tassone rendered ineffective assistance by failing to request a hearing under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), in response to the state's DNA evidence. As adopted by Florida's courts, *Frye* requires that the proponent of expert evidence "establish[] by a preponderance of the evidence the general acceptance of the underlying scientific principles and methodology." *Marsh v. Valyou*, 977 So. 2d 543, 547 (Fla. 2007) (per curiam). Taylor insists that when the state initially proffered the DNA evidence against him, Tassone should have moved for a *Frye* hearing to challenge both the accuracy of the DNA-analysis procedure and Dr. Pollock's adherence to that procedure. Had the trial court ruled in his favor, Taylor argues, it might have excluded the DNA evidence.

The Florida Supreme Court (and the federal district court, in turn) ruled that Tassone wasn't ineffective because his performance—*i.e.*, his failure to move for a *Frye* hearing—wasn't constitutionally deficient. We find that we needn't address the adequacy of Tassone's performance because we conclude that any deficiency, if it existed, wasn't prejudicial. Because the Florida Supreme Court didn't reach the prejudice prong of *Strickland*, we review the issue de novo.

To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* For ineffective-assistance claims arising out of a lawyer's failure to file a motion, the prejudice analysis also requires establishing that the motion was meritorious. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

Tassone's failure to move for a *Frye* hearing wasn't prejudicial for two reasons. First, Taylor's *Frye* motion likely would have failed—meaning that the DNA evidence likely would have been admitted anyway. Tassone acknowledged that his *voir dire* of Dr. Pollock covered some of the same issues that a *Frye* hearing would have, and the later evidentiary hearing confirms as much: Taylor's post-conviction counsel asked the same questions that Tassone asked at trial and explained that "[b]asically what we're doing now is a *Frye* Test." It seems to us exceedingly unlikely that the same judge who certified Dr. Pollock as an expert following Tassone's thorough *voir dire*—which, again, covered *Frye* material—would have then excluded Dr. Pollock's evidence on a *Frye* motion. To the contrary, it seems to us quite likely that, even following Tassone's rigorous *voir dire* and over his objection at trial, the trial judge remained convinced that Dr. Pollock was a qualified expert.

Taylor asserts that although the trial judge accepted Dr. Pollock as an expert on DNA analysis generally, he did so without

regard to the disputed DNA-analysis procedure, and that Dr. Pollock's alleged deviations from that procedure would have changed the trial court's mind. But Dr. Pollock's procedure didn't even give Tassone misgivings about his expertise, despite Tassone's obvious incentive to challenge his testimony.[2] It seems exceedingly unlikely that the trial judge would have drawn a conclusion that Tassone himself did not.

Second, even if a *Frye* motion had been filed and granted, the verdict likely wouldn't have changed: The jury had ample evidence before it to convict Taylor even without the DNA. The state presented evidence of Taylor's location at the time of the murder; the jewelry found buried at his former residence; that he was seen digging near the jewelry's location; his tacit confession to Officer Bogers; his jailhouse confession to cellmate Timothy Cowart; and testimony that Taylor—but not his co-defendant—matched the secretor type of the semen found at the crime scene. *See Taylor I*, 630 So. 2d at 1039–40; *Taylor IV*, 2021 WL 2003122, at *8 & n.10; *Murray v. State*, 3 So. 3d 1108, 1113 (Fla. 2009) (per curiam).

---

[2] Tassone wasn't unaware of the distinction between analysis and procedure. Tassone testified that he was comfortable enough with the substance of the DNA analysis based on his research to cross-examine Dr. Pollock—research that covered both the substance *and* procedure of Dr. Pollock's examination. And what we know of his preparation confirms this. Tassone presented the state's reports to Dr. Goldman and had lengthy discussions with him about DNA—the billing records indicate that Tassone and Dr. Goldman spent an hour and fifteen minutes discussing the report.

21-12883                Opinion of the Court                15

In short, we reject Taylor's ineffective-assistance claim predicated on Tassone's failure to move for a *Frye* hearing on the ground that any deficiency wasn't prejudicial.

**2**

Taylor separately contends that Tassone rendered ineffective assistance by failing to request a hearing under *Richardson v. State*, 246 So. 2d 771 (Fla. 1971), when he learned about Shirley Zeigler at trial.

A *Richardson* hearing is a proceeding under Florida law by which a criminal defendant can challenge a discovery violation. Under *Richardson*, the reviewing court assesses whether a discovery violation resulted in harm or prejudice to the defendant; in doing so, the court considers circumstances such as whether the violation was "inadvertent or willful" and "trivial or substantial" as well as what effect, if any, the violation had on "the ability of the defendant to properly prepare for trial." *Id.* at 775. "[W]here the court determines that the state's noncompliance with the rule has not prejudiced the ability of the defendant to properly prepare for trial," the record must affirmatively show that lack of prejudice. *Id.* Had Taylor's *Richardson* challenge succeeded, the district court could have imposed an appropriate sanction. The strongest sanction—and the most helpful to Taylor—would have been excluding the DNA evidence on the ground that, by withholding Zeigler's initials, the state prevented Taylor from adequately preparing to challenge that evidence at trial.

The Florida Supreme Court held that Tassone's failure to move for a *Richardson* hearing didn't constitute ineffective assistance. We can resolve this issue the same way we resolved the *Frye*-related ineffective-assistance claim: Even if Tassone's failure to seek the hearing constituted deficient performance, Taylor's claim founders because he suffered no prejudice. Taylor likely wouldn't have prevailed on the *Richardson* motion, and even if he had, the outcome of the trial likely would have been the same. As before, because the Florida Supreme Court decided the *Richardson*-based ineffective-assistance claim on *Strickland*'s deficiency prong, we review the prejudice prong de novo.

Taylor likely wouldn't have won a *Richardson* motion because, as a matter of state law, the state's discovery violation—if there was one—didn't harm or prejudice him. As an initial matter, the alleged violation likely wasn't willful. *See id.* The state couldn't have intentionally withheld discoverable evidence created by Zeigler because there wasn't a discoverable report of hers to disclose: She didn't do any tests or write a report; she merely reviewed Dr. Pollock's report and compared it to her computer printout.

Moreover, the alleged violation wasn't "substantial," nor did it affect Taylor's ability to prepare for trial. Tassone wasn't blindsided by Zeigler's name during the trial. *Id.* He knew that the initials "JP" meant that Dr. James Pollock had worked on the report, and he knew that there was another set of initials, "SZ." Further, because Zeigler didn't do any analysis on the case, she couldn't

have testified to any of the protocol-related issues on which Taylor stakes his *Brady* and *Frye* arguments—meaning that Tassone couldn't have questioned her on Dr. Pollock's adherence to procedure.

Indeed, not even Zeigler thought that her testimony would have aided Taylor at trial. When asked at the post-conviction evidentiary hearing whether it would have been helpful for the defense to have her results, she responded, simply, "No." She also described her results as a "redundant piece of material" because both computer printouts reported the same findings. When Taylor's counsel used the word "disputes" throughout the evidentiary hearing to compare her findings to Dr. Pollock's results, Zeigler repeatedly stated that they weren't disputes, only "differences"—a distinction that she found significant. As already explained, although Zeigler testified that it was a violation of protocol for Dr. Pollock to conclude that two of the probes were conclusive, that critique doesn't change our conclusion. That Tassone would have liked to have had Zeigler's testimony to help him cross Dr. Pollock isn't enough to show prejudice.

For all these reasons, we reject Taylor's contention that Tassone provided ineffective assistance of counsel by failing to move for a *Richardson* hearing. That failure, even if constitutionally deficient, didn't prejudice Taylor.

**D**

Finally, Taylor asserts that the statement that he made to Officer Bogers should have been suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. As a refresher, after the police collected DNA samples from Taylor, he asked Officer Bogers how long it would take to get the results back. Officer Bogers responded by asking Taylor "why," to which Taylor replied that he "was just wondering when they would be back out to pick him up." *Taylor VI*, 2021 WL 2003122, at *24.

A defendant who has invoked his right to counsel, as Taylor did, cannot be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (call number omitted).

The Florida Supreme Court held that Officer Bogers's question to Taylor didn't constitute an "interrogation." Applying AEDPA deference, we agree. A reasonable jurist could interpret Officer Bogers's question—"Why?"—in response to Taylor's question as ordinary, run-of-the-mill conversation rather than the sort of query that a reasonable officer would have known would elicit an incriminating response. And whatever happened here, the *ex ante* likelihood that a suspect would answer a question like Officer

Bogers's with incriminating information seems exceedingly small—or so, in any event, a reasonable jurist could conclude. That's especially true if we're also to believe, as Taylor urges, that his question about when the DNA analysis would be complete didn't re-initiate the conversation with Officer Bogers. If Taylor's question was casual enough that it didn't constitute a re-initiation, then a reasonable jurist could certainly conclude that Officer Bogers's follow-up was casual enough that it didn't constitute interrogation.

## IV

To summarize, we hold as follows: The district court correctly held that the state didn't violate *Brady*, that Taylor's trial counsel didn't provide ineffective assistance at trial—for failing to move for hearings under either *Frye* or *Richardson*—and that *Miranda* doesn't require suppressing Taylor's statement to Officer Bogers. Accordingly, we affirm the district court's ruling on all counts.

**AFFIRMED.**